STRANAHAN ET AL., APPELLANTS, *v.* INDEPENDENT NAT-
URAL GAS CO. ET AL., RESPONDENTS.

(No. 7,305.)

(Submitted January 8, 1935.   Decided January 24, 1935.)

[41 Pac. (2d) 39.]

598

*Mr. J. W. Freeman* and *Mr. C. R. Stranahan,* for Appellants, submitted an original and a reply brief; *Mr. S. C. Ford,* of Counsel, and *Mr. Stranahan* argued the cause orally.

600

*Messrs. Hall & McCabe, Mr. Max P. Kuhr* and *Mr. G. S. Frary,* for Respondents, submitted a brief; *Mr. H. C. Hall* and *Mr. Kuhr* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Plaintiffs on October 27, 1930, entered into an oil and gas lease describing lands in Hill and Blaine counties, with A. H. Perkins, trustee. The lease was for the term of five years and as long thereafter as oil and gas, or either of them, were produced from these lands in commercial quantities. The lease provided for the payment of rentals for delay in drilling operations during its express term. Drilling operations under the lease resulted in the bringing in of a commercial gas well on June 17, 1931, with an open flow of 7,500,000 cubic feet of gas per day. Thereafter it was discovered that certain lands had been omitted from the description in the lease, and on August 28, 1931, an amended lease was executed by the parties in substitution for the old lease. The provisions of the two leases were in most respects identical.

The new lease provided (1) that the gas well already completed was "deemed and agreed to be a full compliance with the terms and conditions of this lease as to the drilling of the first well"; (2) that the term of the lease should be for five years from date and as long thereafter as oil and gas, or either of them, in commercial quantities was produced from the lands described; (3) for the marketing and payment of the lessor's portion of the oil produced; (4) for the payment of royalty for gas produced, in cash from the gross proceeds derived from its sale; (5) for the payment of delay rental; (6) for the drilling of an oil well within five years in the event commercial gas was produced; (7) that "if the lessee hereunder shall discover and produce commercial oil or gas within said premises, then the lands described in this lease shall be developed in accordance with the best field practice as a producing oil and gas field, placing a well on each and

every such subdivision as will be justified by good oil field practice consistent, [consistent with good oil field practice?] and provided that there is a reasonably remunerative market for the same''; (8) that the lease may be canceled for the failure to develop the lands described, in accordance with good field practice as herein provided, "upon written notice requiring the lessee or assignee to perform the terms of said lease, giving the reason and a statement of the facts claimed why the lessor claims the said lease has not been kept and performed''; (10) that "all commercial oil and gas delivered upon the said premises shall be conveyed to the main pipe line or lines from such premises''; (11) that "the number of wells drilled and the method of the location of the wells and marketing of the products and operations of the said lease shall be done in accordance with the best oil or gas field practice, and lessee's operations shall be governed at all times by what may be termed reasonable diligence''; and (12) that "if the said lessee, his successor or assigns, shall fail to fully keep and perform each and every covenant herein contained to be by him kept and performed, then the lessor shall have the right to forfeit this lease and all rights of the lessee hereunder, provided, that after discovery of commercial oil or gas the lessee shall be entitled to thirty days after written notice from the lessor specifying the condition or conditions wherein the lessee is at fault, before forfeiture can be effected.'' Other provisions are found in the lease, which are unimportant in this controversy.

The only provision, referred to above, found in the second lease and not in the first, is with reference to the drilling of the first well being deemed in compliance with the provisions of the original lease.

Prior to July 21, 1932, the defendant O'Neil, by virtue of an assignment, was the owner of the oil and gas lease, and the defendant Independent Natural Gas Company became the owner of the lease through an assignment dated February 15, 1932.

On January 21, 1932, O'Neil entered into a contract with the Montana Gas Corporation, the owner of a natural gas pipe

line from the Bowes structure to the towns of Chinook and Havre, whereby O'Neil, from the well heretofore mentioned and other leases of the Box Elder structure, was to furnish one-third of all the gas necessary to supply the market in Havre and Chinook and the surrounding territory for a period of ten years, and for renewals for limited periods on certain conditions. This contract was assigned by O'Neil to the Independent Natural Gas Company on February 17, 1932. Under the contract the Montana Gas Corporation was required to construct and maintain at its cost and expense all necessary gathering lines to transport the gas from the well or wells to its pipe line. The one well on appellants' land is three-quarters of a mile from the pipe line, which is the only gas pipe line in close proximity to their land. The Montana Gas Corporation had the only pipe line supplying gas to Havre, Chinook, and the Chinook sugar factory. The Northwest Utilities Company owns the distributing systems in Havre and Chinook, to which the Montana Gas Corporation sells its gas under contract.

On April 1, 1932, plaintiffs (appellants) served notice on defendants, advising them that they had failed to comply with the lease in the following respects:

(1) "That you have failed to comply with paragraph 1st of said lease; that you have not marketed or made any lawful or proper or diligent effort to market the gas from the well already drilled on said land."

(2) "That you have failed to comply with paragraph 6th of said lease in that you have failed to develop the said leased lands, as a producing gas or oil field, in accordance with the best oil and gas field practice, as provided by the terms of said lease."

(3) "That you have failed to fulfill the spirit of said lease, in that you have failed to use any reasonable diligence to market the gas or to develop the field as a gas field."

Plaintiffs advised defendants that, unless they complied with the terms of the lease in these respects within thirty days, they would cancel it in accordance with its provisions,

and that the contract which, they were informed, had been entered into for the delivery of gas to Havre and Chinook, would not be in compliance with the terms of the lease, in that such contract would be and is void as being in restraint of trade and an attempt to create a monopoly.

Plaintiffs brought this action, under the provisions of section 6902, Revised Codes 1921, on August 12, 1932, for the forfeiture and cancellation of the lease and for damages and penalty. The defendants Perkins and O'Neil filed answer, disclaiming any interest in the leased premises. The defendant Independent Natural Gas Company answered, denying the breach of any of the covenants of the lease, and affirmatively sought to recover attorney fees.

A trial was had, and at the close of plaintiffs' case a motion for nonsuit was granted. Later a judgment dismissing their complaint and awarding defendant $500 as attorney fees and costs, was entered. The appeal is from the judgment.

Plaintiffs specified numerous errors, many of which are not argued. They assign and argue at length that the trial court committed error in sustaining defendants' motion for nonsuit.

This action was brought under the provisions of sections 6902 to 6904, inclusive, Revised Codes 1921. By these sections a purely statutory remedy, not theretofore existing, was conferred, and, although it embodies the equitable relief of a release of record, it is classed as an action at law. (*Berthelote* v. *Loy Oil Co.*, 95 Mont. 434, 28 Pac. (2d) 187.)

Whether any substantial evidence has been introduced by the plaintiffs becomes a question of law for the court on a motion for nonsuit. (*Claypool* v. *Malta Standard Garage*, 96 Mont. 285, 30 Pac. (2d) 89.) When no substantial evidence has been introduced by the party upon whom the burden rests, a question of law for decision by the court is presented. (*Lee* v. *Stockmen's Nat. Bank*, 63 Mont. 262, 207 Pac. 623.) On motion for nonsuit, no case should be taken from the jury when reasonable men may draw different conclusions from the evidence, or where there is substantial evidence to support the complaint, but only where from the undisputed facts the

conclusion necessarily follows, as a matter of law, that a recovery cannot be had on any view which may reasonably be taken from the facts established. (*Claypool* v. *Malta Standard Garage*, supra; *Bell* v. *Grimstad*, 82 Mont. 185, 266 Pac. 394.)

In the consideration of a motion for nonsuit, the court must view the evidence in the light most favorable to plaintiff (*Johnson* v. *Herring*, 89 Mont. 420, 300 Pac. 535; *Boyd* v. *Great Northern Ry. Co.*, 84 Mont. 84, 274 Pac. 293), and this is true even though there is a discrepancy in the testimony of the several witnesses for plaintiff (*Hardie* v. *Peterson*, 86 Mont. 150, 282 Pac. 494; *Gohn* v. *Butte Hotel Co.*, 88 Mont. 599, 295 Pac. 262).

The parties made this contract for themselves, and must stand or fall by its terms. (*Steven* v. *Potlatch Oil & Refining Co.*, 80 Mont. 239, 260 Pac. 119.)

It therefore becomes necessary to consider whether, under the terms and provisions of the lease and the notice of cancellation asserting breach thereof in certain particulars, plaintiffs produced evidence warranting the submission of the case to the jury upon the question whether defendants had failed to perform the covenants of the lease.

The evidence of plaintiffs was directed to two propositions: (1) Failure to develop in accordance with the best gas field practice consistent with the market; and (2) failure to use reasonable efforts to market gas from the producing well. One of the plaintiffs testified that the defendant Perkins informed him that, where gas is furnished for use, it is necessary to have gas to supply the immediate demands; there should be reserves, and that it would be necessary to drill at least two more wells for that purpose. The record discloses that Perkins and O'Neil had, at the time of drilling the well on plaintiffs' land, some five or six thousand acres of additional lands on the same structure. The well on plaintiffs' lands was the only commercial gas well on these lands or on the Box Elder structure. One Timmons, a witness on behalf of plaintiffs, testified as an expert that, though one well

might be of sufficient size to supply the amount of gas necessary for the market in Havre and Chinook, it would not be the best practice to depend solely upon one well, and that the determination of the number of wells to be drilled on a certain lease, regardless of its acreage, would depend on the consideration of various contingencies. Hubbert, another expert witness, testified it would be good practice to drill other wells on the same lease; as a matter of safety it would be very necessary.

Under the contract for the sale of gas, defendants had found a remunerative market for it. If the foregoing testimony with reference to the oil field practice in developing reserves is believed, then the defendants under the express covenants would be obliged to drill at least one additional well in order to develop the lease and supply and maintain the existing market. True, these witnesses admitted that there were some contingencies entering into the development, such as geological conditions, requirement of other leases, etc. In the absence of proof eliminating them, these contingencies would tend either to weaken the force of the testimony of the experts, or at least to create a discrepancy or conflict in the testimony of plaintiffs' witnesses. But, viewing the testimony in the light most favorable to plaintiffs' case, we think there was sufficient evidence to justify the submission of the case to the jury on the question of whether or not the lease had been lost for failure to further develop.

The only market mentioned in the evidence is in Havre, Chinook and vicinity. The Northwestern Utilities Company, which obtained its gas under contract with the Montana Gas Corporation, has the only distributing systems in these towns.

Under the express provisions of the lease, before a forfeiture ensued for the breach of its covenants, it was necessary for the lessors to serve a notice specifying the condition or conditions wherein the lessee was at fault. The notice bearing date April 1, 1932, charged the defendants with the failure to perform the condition of the first paragraph of the lease, in that they had failed to market, or make a diligent effort

to market, gas. This paragraph relates solely to marketing oil and makes no reference to gas. Neither the allegations of the complaint nor the evidence relate to the marketing of oil.

The sixth paragraph of the lease provided that, after the ▇ discovery of commercial gas within the premises, the lands described in the lease were to be developed in accordance with the best field practice as a producing gas field, provided there was a reasonably remunerative market for the same. The sixteenth paragraph provided that commercial gas discovered upon the premises should be conveyed to the main pipe line or pipe lines from such premises. By these enumerated provisions, the lessee was obliged to deliver the gas to the pipe line. Plaintiffs attempted to prove that, if a pipe line was built from the lease to Havre and a distributing system installed and the gas sold at a lower rate, it was thought the demand for gas in Havre would be greatly increased. No evidence suggests that an additional market might be found for the gas by delivering it to the pipe line, which was the extent of the lessee's obligation. The lessee did not expressly agree in the lease to build a distributing system in, and a pipe line to, Havre. No case has been found wherein a covenant was implied to this extent.

As we understand the contention of plaintiffs with reference ▇ to the alleged failure on the part of the defendants to market gas, it is that the contract whereby for a period of ten years one-third of all the gas to be consumed in Havre and Chinook and the territory within five miles adjacent thereto was to be obtained from the lease then owned by the Independent Natural Gas Company on the Box Elder structure, and whereby for a like period the lessee of the lease in question agreed not to sell gas to others within this market, creates a monoply, is in restraint of trade, and therefore null and void.

Plaintiffs assert that this contract is invalid under section 20 of Article XV of our Constitution and sections 10901 and 7559, Revised Codes 1921. The defendants argue that the

plaintiffs, not being parties to the gas contract and therefore strangers to it, are in no position to assert the invalidity of the contract, under the rule announced by this court in the case of *MacGinniss* v. *Boston & Montana Consolidated Copper & Silver Mining Co.*, 29 Mont. 428, 75 Pac. 89. Plaintiffs respond they are in privity with the parties to the contract, and for that reason in a position to urge that the contract is invalid.

Under the contract for the sale of the gas, the buyer is required to install gathering lines and authorized to install the necessary equipment on the leased premises in order to produce the gas. If not by express provision, by necessary implication, he is authorized to enter upon the leased premises in order to perform the necessary work of installing these appliances and equipment and keeping them in working condition. The theory of defendants is that the contract is nothing more than one for the sale of personal property. In a number of decisions under somewhat similar contracts, the courts have taken the position that such contracts were something more than for the mere sale of personal property, and have afforded equitable relief to enforce the covenants of such contracts as against persons subsequently acquiring an interest in the land or leased premises with notice. (See *Southwest Pipe Line Co.* v. *Empire Natural Gas Co.*, (C. C. A.) 33 Fed. (2d) 248, 64 A. L. R. 1229, and note.) We think the plaintiffs, under the foregoing authorities, are in a position to assert the alleged invalidity of the contract.

This court in the case of *Great Northern Utilities Co.* v. *Public Service Commission*, 88 Mont. 180, 293 Pac. 294, 304, while discussing the purpose of section 20, Article XV, of our Constitution, said: "The 'object sought to be attained' by the framers of our Constitution, and the people of this state in the adoption of that Constitution, was not that every combination was proscribed, nor that the making of every contract was forbidden, but rather that it was the purpose to forbid the formation of a combination, or the making of a contract, if the purpose of such combination or contract was

to fix the price or regulate the production of any article of commerce so as to unlawfully take advantage of the public." And in speaking of section 10901, as well as of the same section of the Constitution, it said: " 'The section of the statute quoted involves the same idea and demands the same construction, though it is more specific in its provisions, and extends to and includes combinations in restraint of competition in transportation. It denounces every form of combination or contract *which has for its purpose,* directly or indirectly, the restraint of production or trade in any way or manner, or the *control of the price of any article of consumption by the people.*' Continuing, the court says: 'It was not the purpose of the convention, or of the Legislature, to limit either the term used in the Constitution, or in the statute, by any narrow definition, but to leave it to the courts to look beneath the surface, and, from the methods employed in the conduct of the business, to determine whether the association or combination in question, no matter what its particular form should chance to be, or what might be its constituent elements, is taking advantage of the public in an unlawful way. (Citing the case of *Harding* v. *American Glucose Co.,* 182 Ill. 551, 55 N. E. 577, 74 Am. St. Rep. 189, 64 L. R. A. 738.) In each case, therefore, under these provisions, the nature of the arrangement or combination is a question of fact to be determined by the court from the evidence before it, or from the vice which inheres in the contract itself.' "

In view of the fact that on another trial the evidence will doubtless be somewhat different in its scope, extent, and effect, it would be of no benefit to the trial court to comment further on this phase of the case.

The other questions argued are not likely to arise on another trial, with the possible exception as to the proper rate of mileage chargeable for witnesses. The defendants made cross-assignment of error seeking to have the action of the trial court on motion reducing the rate of mileage from ten to seven cents a mile reviewed. This question may properly be

raised only on a cross-appeal. (*In re Silver's Estate,* ante, p. 141, 38 Pac. (2d) 277.)

The judgment is reversed and the cause remanded to the district court of Blaine county, with direction to grant the plaintiffs a new trial.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES MATTHEWS, STEWART and MORRIS concur.

Rehearing denied February 8, 1935.